

# UNIVERSITY OF MICHIGAN
## SCHOOL OF SOCIAL WORK

**FAMILY ASSESSMENT CLINIC**
555 S. Forest Avenue
Ann Arbor, MI 48104-2531
(734) 998 9700  Fax (734) 998 9710

Date:   May 4, 2010

To:     Ian Bauer, Assistant Attorney General, State of Washington

From:

 Kathleen Coulborn Faller, Ph.D., A.C.S.W.
Marion Elizabeth Blue Professor of Children and Families
Director, Family Assessment Clinic
School of Social Work University of Michigan

Re:     Robyn VanLohuizen v State of Washington

I note that depositions continue to be taken in this case. Therefore my opinion is preliminary.

Questions:

1. Was the standard of Care breeched in May 2006?

In the documents I reviewed, I did not see evidence that the standard of care had been breeched.

2. Should the petition on her son have been founded?

Since Robyn VanLohuizen has had a long CPS history, a chronic problem in keeping a safe and sanitary environment for her children, Eric was doing very poorly in school, and the family was in need of services, founding a report was warranted. CPS cannot elect not to found a case because a caretaker's employment might be at risk.

Robyn VanLohuizen has two children, Ashley, born 10/25/1986, and Eric, born 8/8/1991. Ms. VanLohuizen has a history of referrals to Child Protective Services, which began in 1990, when her daughter, Ashley, was 4 years old. Altogether there were 33 referrals between 1990 and 2006, 8 of which were founded, when the 5/5/06 referral is included. These referrals have been

made by her children's school for poor attendance, lice and scabies, injuries, lack of adequate clothing and hygiene, and vandalism. In addition, referrals for lack of adequate supervision, neglect, and abuse appear to have been filed by neighbors, babysitters, and relatives.

Ms. VanLohuizen was a single parent and a Certified Nurse's Assistant who worked evenings in a nursing home. She experienced chronic challenges providing her children with adequate child care, relying primarily on a series of young male live-in babysitters, and chronic difficulties keeping her house clean and safe. As Ashley became older, Ms. VanLohuizen requested court intervention twice because her daughter was incorrigible. The VanLohuizen family intermittently received services to help them address the issues in the founded reports. Generally, however, Ms. VanLohuizen was cooperative when services related to Ashley's incorrigibility and unreceptive when services focused on her maltreatment of her children.

With regard to the complaint filed by Ms. VanLohuizen, there are some inconsistencies between what is asserted in the complaint and the case record. First, the record does not reflect that Jodi Lamoreaux, the CPS supervisor, participated in the home visit on 5/5/06. Mikey Anderson, who is the father of Michael Anderson, the target of the 5/5/06 investigation, stated only one worker was present. Whether or not Jodi Lamoreaux was present may be determined when she is deposed. Jodi Lamoreaux is a major target of the complaint. She is asserted to have told Ms. VanLohuizen to "shut up" when Ms. VanLohuizen objected to the investigation. According to the complaint, Ms. Lamoreaux stated that she was going to file a report against Ms. Vanlohuizen and make it stick. Ms. Lamoreaux also allegedly told her she would not lose her job if the case was founded.

It appears that the referral which was substantiated against Ms. Vanlohuizen was actually filed by Erin Schumacher on 5/5/06, based upon the fact that Eric, also a child, was living in the unsanitary residence, and Ms. Vanlohuizen's long history of referrals to CPS (33 referrals). Dog feces were found in Eric's bedroom. He was interviewed on 5/5/06 and acknowledged the house was dirty and the dog feces were in his room, which he did not clean up because he would have been late to school.

Ms. Schumacher also had a call with Ashley McGrath, Ms. Vanlohuizen's daughter, on 5/10/06. When Ashley said her mother raised concerns that a founded referral might cause her to lose her job, that Ms. Schumacher stated that Ms. Vanlohuizen had had other founded referrals (7 referrals) that had not resulted in job loss.

Second, there is no evidence in the case record that Robyn VanLohuizen resisted the investigation. The record and the photographs sent with the record indicate that Ms. Schumacher and the law enforcement officer who accompanied her were allowed to take about 60 photographs of the condition of the house. The Policies and Procedures Manual allows for a request for law enforcement involvement when in a CPS investigation.
"20. Request the assistance of law enforcement to:
1. Assure the safety of the child(ren) or staff.

2

    2. Observe and/or preserve evidence.
    3. Take a child(ren) into protective custody.
    4. Enforce a court order.
    5. Assist with the investigation."
It appears that reasons 1-3 & 5 apply to this investigation.

The State of Washington use of law enforcement during investigation is consistent with practice in other states and with current child welfare practice standards which allow for joint investigation of reports to child protective services.

Third, removal of Michael appears consistent with the Policies and Procedures Manual, which states: 2. RCW 26.44.056 and RCW 13.34.050 provide that a child may be removed from a biological parent, adoptive parent, or legal guardian when CPS or law enforcement determines that the child would be at risk of imminent harm or danger if left with the parent. Only law enforcement may remove a child from a biological or adoptive parent or legal guardian or custodian without a court order. According to the deposition of Mikey Anderson, Michael was placed with a maternal aunt, Jodi VanLohuizen, who arrived during the investigation.

The requirement that law enforcement be involved in emergency removals when the child protection agency does not have a court order is consistent with policy in other states and with current child welfare practice standards for emergency removals.

Fourth, the record reflects that Ms. VanLohuizen lived in the house which was the subject of the CPS referral, and her grandson, Michael, was with her when the investigation was initiated. Her daughter, Ashley, her boyfriend, Michael, and another young man, lived upstairs, and Ms. VanLohuizen and Eric lived downstairs. Although there are two apartments, this is a house that appears to be one residence. Thus, the referral was not on a different residence. The specifics of the referral reflect concerns about the house and not one specific floor or apartment in the house.

Fifth, the statement in the complaint that there was no home visit after the initial investigation and that Ms. VanLohuizen was unaware of the founding of an allegation against her in inconsistent with the case record. There was another home visit on 5/9/06 by Erin Schumacher, who inspected the house. Social Worker Schumacher informed Ashley, Michael, maternal grandmother, Lucella Vanlohuizen, of a Family Team Meeting the next day (5/10/06) regarding placement of the baby, Michael. Robyn VanLohuizen was at the Family Team Meeting. There were also 2 office visits in May, involving Ashley and Robyn VanLohuizen. According to the case record, Ms. Vanlohuizen spoke specifically about her fear that she would lose her job because of the founding of the referral. On 5/17/06, Robyn VanLohuizen signed a safety agreement for Eric, which indicates that at that point she knew she had a founded referral. Agency policy supports the development of a safety agreement when a referral is founded and a child remains in the home. Agency policy states the social worker should endeavor to get the caretaker to sign the safety agreement, which occurred in the VanLohuizen case.

Sixth, the complaint against the State of Washington asserts there was a 3 month gap between being placed on the registry and notification (which is signed by Supervisor Jodi Lamoreaux). Robyn VanLohuizen informed the agency after the fact that had moved in with her mother and did not get the letter because it was sent to her old address; sent July 19, 2006—returned after a "10 day hold—moved, left no address; return to sender"; eventually it was delivered 8/11/06). Robyn VanLohuizen requested an administrative review on 8/24/06. On 9/27/06 Debbie Lynn from the Department of Social and Health Services sent a letter indicating that the decision to found the referral was correct and included information on how to ask for an administrative law review hearing. This letter was received and signed for on 9/28/06 by Robyn VanLohuizen.

Agency policy is as follows:

RCW 26.44.100

3. The notification required by this section shall be made by certified mail, return receipt requested, to the person's last known address.

RCW 26.44.100

4. The duty of notification created by this section is subject to the ability of the department to ascertain the location of the person to be notified. The department shall exercise reasonable, good-faith efforts to ascertain the location of persons entitled to notification under this section.

Thus, Department policy was followed, although there was a delay in formal notification, because Ms. VanLohuizen had moved. As noted above, she was also aware of the founded referral on May 17, 2006, when she signed the safety plan for Eric.

The State of Washington notification policy is consistent with child welfare standards of practice.

With regard to the allegation involving Eric, this was filed by the investigating worker on May 5, 2006, the date of the investigation of the dirty house referral. This case was classified at intake as moderate risk. Filing a referral when other children are found to be at risk during a CPS investigation is consistent with best practice in child welfare. Eric was subsequently interviewed by CPS social worker, Erin Schumacher. The school was contacted to determine Eric's school performance and attendance. Both were very concerning. The case involving Eric was founded and services including in home support, counseling, and tutoring for Eric were offered. Ms Vanlohuizen did not take advantage of services.

**Policies and procedures manual** provides for the following:

**3210. Investigation**

1. Investigate (assess) referrals which allege child abuse and neglect (CA/N) or the risk of CA/N to determine the existence or absence of CA/N.  2. The department shall arrange for legal intervention when needed.

4. CPS may interview children outside the presence of the parents but must notify parent (s) of the interview at the earliest possible point in the investigation that will not jeopardize the safety or protection of the child or the course of the investigation.

The State of Washington's policy regarding investigation of reports and founding of reports are consistent with current child welfare standards of care.